IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

AARON L. TIMMONS,                      §
                                       §
        Plaintiff,                     §
                                       §
V.                                     §        CIVIL ACTION NO. H-12-965
                                       §
CAROLYN W. COLVIN, ACTING              §
COMMISSIONER OF THE SOCIAL             §
SECURITY ADMINISTRATION,[1]            §
                                       §
        Defendant.                     §

### MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[2] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No.13), Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 14), Defendant's Motion for Summary Judgment (Document No.12) and Plaintiff's Response to Defendant's Motion for Summary Judgment (Document No.15). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is substituted for Michael J. Astrue as the defendant in this action.

[2] The parties consented to proceed before the undersigned Magistrate Judge on August 9, 2012. (Document No. 8).

Judgment (Document No. 12) is DENIED, Plaintiff's Motion for Summary Judgment (Document No.13) is GRANTED, and the decision of the Commissioner is REMANDED for further proceedings.

## I. Introduction

Plaintiff, Aaron Lee Timmons ("Timmons") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying his application for adult child's disability benefits based on the income of his deceased father. Timmons argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, Rafael Lugo-Vilanova, committed errors of law when he found that Timmons was not disabled. Timmons argues that ALJ misconstrued his application as a claim for disability insurance benefits ("DIB"), and as a result looked at a much narrower period of time from January 1, 1984 through March 31, 1986, when he should have considered up to and including his 22nd birthday on November 18, 1988. Timmons argues that his application clearly identified that he was not applying for DIB based on his own earnings record but was applying for child benefits on his deceased father's account and that this was the reason his birth certificate and divorce decree are part of the administrative record. He further argues his reliance of Social Security Ruling ("SSR") 83-20 and the submission of personal statements was brought to the attention of the ALJ at the hearing. He further argues that the ALJ failed to fully develop the record by improperly discounting the non-medical evidence that he had submitted as expressly provided by SSR 83-20, and by not utilizing the services of a medical advisor to assist in determining the onset date of disability and whether he was disabled on or before

November 18, 1988.  According to Timmons, because he was not given the opportunity to fill in the missing evidentiary gaps as provided by SSR 83-20 he was denied his right to full and fair hearing on his claim for adult child's disability benefits. He seeks an order remanding his claim for further consideration. The Commissioner responds that medical evidence is a prerequisite of establishing a severe impairment at step two and given the absence of *any* medical evidence to show that Timmons was disabled prior to the expiration of his insured status, the ALJ did not err.  The Commissioner further responds that the ALJ's failure to construe Timmons' claim as an adult child benefit claim was harmless because the outcome would be the same under either time frame because the medical records show that Timmons had no severe impairment prior to 2008. According to the Commissioner, Timmons should have advised the ALJthat he was applying for child benefits on his father's account. The Commissioner argues there is substantial evidence in the record to support the ALJ's decision that Timmons was not disabled, that the decision comports with applicable law, and that the decision  should, therefore, be affirmed.

## II.  Administrative Proceedings

On April 8, 2008, Timmons filed for disability insurance benefits as a disabled adult child based on his father's account. (Tr. 89-90). He alleged he was disabled prior to his 22nd birthday on or about November 18, 1988, due to schizophrenia.  The Social Security Administration denied his application at the initial and reconsideration stages.  (Tr.44-54). Timmons then requested a hearing before an ALJ.  (Tr.  55-56).  The Social Security Administration granted his request, and the ALJ held a hearing on June 8, 2010. (Tr.  24-41). On August 23, 2010, the ALJ issued his decision finding Timmons not disabled. (Tr.12-23).  In his decision, the ALJ found that Timmons was not disabled at any time from January 1, 1984, the alleged onset date, through March 31, 1986, the date

Timmons was last insured.

Timmons sought review by the Appeals Council of the ALJ's adverse decision.  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Timmons' contentions, in light of the applicable regulations and evidence, the Appeals Council, on January 9, 2012, concluded that there was no basis upon which to grant Timmons' request for review. (Tr. 1-6).  The ALJ's findings and decision thus became final. Timmons has timely filed his appeal of the ALJ's decision.  The Commissioner has filed a Motion for Summary Judgment (Document No. 12), to which Plaintiff has responded. (Document No. 15).  Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 13), to which Defendant has filed a Response. (Document No. 14).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 512. (Document No. 9).  There is no dispute as to the facts contained therein.

**III.  Standard for Review of Agency Decision**

The court, in its review of a denial of disability benefits,  is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows:

"[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

**IV.  Burden of Proof**

An individual claiming entitlement to disability insurance benefits under the Act has the

burden of proving her disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act

defines disability as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and

laboratory diagnostic techniques.  *Id.*  § 423(d)(3).  The impairment must be so severe as to limit

the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age,
> education, and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists in the
> immediate area in which [she] lives, or whether a specific job vacancy exists for
> [her], or whether [she] would be hired if [she] applied for work.

*Id.*  § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is

suffering from a disability.  Rather, a claimant is disabled only if she is "incapable of engaging in

any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting

*Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

Here, Timmons applied for benefits as a disabled adult child pursuant to 20 C.F.R.        §

404.350 based on the earnings record of his deceased father.  With respect to qualifying for disabled

child benefits, the ruling provides in pertinent part:

> (a) General. You are entitled to child's benefits on the earnings record of an insured
> person who is entitled to old-age or disability benefits or who had died if--
>
> > (1) You are the insured person's child, based upon a relationship
> > described in §§ 404.355 through 404.359;

6

(2) You are dependent on the insured, as defined in §§ 404.360 through 404.365;

(3) You apply;

(4) You are unmarried; and

(5) You are under age 18; you are 18 years old or older and have a disability that began before you became 22 years old; or you are 18 years or older and qualify for benefits as a full-time student as described in § 404.367.

(b) Entitlement preclusion for certain disabled children. If you are a disabled child as referred to in paragraph (a)(5) of this section, and your disability was based on a finding that drug addiction or alcoholism was a contributing factor material to the determination of disability (as described in § 404.1535) and your benefits ended after your receipt of 36 months of benefits, you will not be entitled to benefits based on disability for any month following such 36 months regardless of the number of entitlement periods you have had if, in such following months, drug addiction or alcoholism is a contributing factor material to the later determination of disability (as described in § 404.1535).

A claimant applying for disabled adult child benefits will be found disabled if he is unable "to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §404.1505.(a). The Commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not

disabled" must be made; and

5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

20 C.F.R. § 404.1520(a); *Leggett v. Chater*, 67 F.3d 558, 563 n. 2 (5th Cir. 1995; *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

Here, documentation submitted by Timmons shows that he is the son of deceased insured (Tr.160, 460), and that he is in not married. (Tr.170-178, 461-469). At issue is whether Timmons became disabled before he reached age 22 on November 18, 1988, due to schizophrenia.

In the instant action, the ALJ determined, in his August 23, 2010, decision that Timmons last met the insured status on March 31, 1986, and that he had not engaged in substantial gainful activity from his alleged onset date of January 1, 1984, through the date he was last insured (step one); that he had medically determinable impairments, depression and schizophrenia but that his impairment or combination of impairments were not severe and did not significantly limit his ability to perform basic work related activities (step two) and he was not disabled. With respect to his step two determination, the ALJ wrote:

In reaching the conclusion that the claimant did not have an impairment or combination of impairments that significantly limited his ability to perform basic work activities, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)–i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques– that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant testified that he could not work because of schizophrenia. He said he had mental problems before he was 22 years old when he was in prison. He was incarcerated from 1986 to 1993. He has been treated with Haldol.

The claimant's mother testified that the statement (Exhibit 10E) is true and correct statement of the facts. She said that the claimant had mental problems when he was 16 years old.

The undersigned has also considered the statements submitted (Exhibits 12E and 11E). However, there is simply no medical evidence to support the statements.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with finding that the claimant has no severe impairment or combination of impairments for the reasons explained below.

There are no medical records to support a severe impairment prior to 2008.  The

9

records from Health Services Archives from 2003 to 2008 do not support a severe impairment (Exhibit 4F). There are no severe impairments in the records from Doctor's Hospital Tidwell from 2002 to 2009 (Exhibit 1F). All of the other medical records are after 2008.

As for the opinion evidence, the undersigned has duly considered the State agency medical consultant's opinion that the claimant's impairments are not disabling. The state agency physicians found there was insufficient evidence to establish a severe impairment prior to date last insured (Exhibits 5F, 6F, 7F, and 8F). These opinions are consistent with the medical record, including that of an examining physician, which shows frequent outpatient records of subjective complaints, but little objective evidence to substantiate the claimant's allegations (Social Security Ruling 96-6p). Therefore, the undersigned has afforded significant weight to these opinions, which also support a conclusion that the claimant is "not disabled."

Because the claimant had medically determinable mental impairments, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

The first functional area is activities of daily living. In this area, the claimant had mild limitation. The next functional area is social functioning. In this area, the claimant had mild limitation. The third functional area is concentration, persistence or pace. In this area, the claimant had mild limitation. The fourth functional area is episodes of decompensation. In this area, the claimant had experienced no episodes of decompensation which have been of extended duration.

Because the claimant's medically determinable mental impairments caused no more than "mild" limitation in any of the first three functional areas and "no' episodes of decompensation which have been of extended duration in the fourth area, they were nonsevere (20 CRF 404.1520a(d)(1). (Tr. 18-19).

As a result, the Court must determine whether substantial evidence supports the ALJ's step two finding.

At step two, the claimant bears the burden of showing that he has a severe impairment or combination of impairments. A severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work

activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); *cf.* 20 C.F.R. §§ 404.1521(a), 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."). The step two requirement that the claimant have a severe impairment is generally considered to be "a de minimis screening device to dispose of groundless claims." *Smoven v. Chater*, 80 f.3d 1273, 1290 (9th cir. 1996) (citing to *Bowen v. Yuckert*, 482 U.S. 137, 153-154 (1987)). The regulations require a claimant to show only "*a* severe" impairment, that is *one* severe impairment in order to avoid a denial of benefits at step two. As such, the failure to find a particular impairment severe at step two is not reversible as long as the ALJ finds that at least one other impairment is severe. Moreover, even if an impairment is found non-severe at step two, at step four, an ALJ must "consider the limiting effects of all [a claimant's] impairment(s), even those that are not severe, in determining [RFC]." 20 C.F.R. §§ 404.1545(e), 416.945(e); *see also* Social Security Ruling 96-8p, 1996 WL 374184, at *5. The Fifth Circuit Court of Appeals in *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985) set forth the standard for determining whether a claimant's impairment is severe. The Fifth Circuit held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Id.* at 1101, 1104-05. As such, under *Stone*, an impairment causing *any* interference with work ability, even minimal interference, is a severe impairment. *see Scroggins v. Astrue*, 598 F.Supp.2d 800, 805 (N.D.Tex.2009) ("*Stone* provides no allowance for a minimal interference on a claimant's ability to work."). As such, under *Stone*, the ALJ, in evaluating at claimant's impairments at step two,  must set forth the appropriate standard by either citing to *Stone* or by applying the Fifth Circuit's construction of §404.1520(c). *Stone*, 752 F.2d at 1106.  The Fifth

Circuit further instructed that should an ALJ fail to properly apply *Stone* severity standard, that the matter must be reversed and remanded. *Id.* at 1106.

## V.  Discussion

Timmons seeks child insurance benefits based on his deceased father's earnings record. Timmons alleges he was disabled before he turned age 22 on or about November 18, 1988, due to schizophrenia.[3]

There are no contemporaneous records from the time frame Timmons argues he was disabled, namely,  before he turned 22 on November 18, 1988. The medical records are from treatment Timmons received from 2002 to 2009.  Records from Doctors Hospital Tidwell are for non-mental health related treatment. For instance, Timmons was hospitalized for uncontrolled diabetes and a respiratory tract infection from August 5-August 9, 2005. (Tr. 195-207). In March 2009, Timmons

---

[3] The Merck Manual describes schizophrenia as follows:

Schizophrenia is characterized by psychosis (loss of contact with reality), hallucinations (false perceptions), delusions (false beliefs), disorganized speech and behavior, flattened affect (restricted range of emotions), cognitive deficits (impaired reasoning and problem solving) and occupational and social dysfunction. the cause is unknown, but evidence for a genetic component is strong. Symptoms usually begin in adolescence or early adulthood. One or more episodes of symptoms must last [six months or more] before the diagnosis is made. Treatment consists of drug therapy, psychotherapy, and rehabilitation.

Worldwide, the prevalence of schizophrenia is about 1%. The rate is about 1%. The rate is comparable among men and women and relatively constant cross-culturally. The rate is higher among lower socioeconomic classes in urban areas, perhaps because it is disabling effects lead to unemployment and poverty. Similarly, a higher prevalence among single people may reflect the effect of illness or illness precursors on social functioning. The average age of onset is 18 yr in men and 25 yr in women. Onset is rare in childhood, but early -adolescent onset or late-life onset (when it is sometimes called paraphrenia) may occur.

The Merck Manual, Nineteenth Edition2011 p1559

12

had x-rays and a MRI of his lumbar spine (Tr. 187, 188, 190, 191, 193, 194). On July 10, 2009, x-rays were taken of the rib cage. (Tr. 183, 184, 185, 186, 189, 192).

There are mental health related records from 2003-2009. The records confirm that Timmons had been diagnosed with schizophrenia and was receiving medication. The records do not definitively identify the date of diagnosis or identify the mental health care provider who made the diagnosis. At best, the medical history section of the records identify 1987 or 1988 as the date of diagnosis. For example, a UTMB Mental Health Outpatient Psychiatric Assessment dated November 13, 2003, describes Timmons' psychiatric history as follows: "in 1987, this inmate was seen at MHMRA in Houston for the treatment of A/V hallucination. He was admitted to HCPCx1, Montfordx3. He was on Haldol, Elavil, Cogentin." (Tr. 380-381). Around this same time, Timmons was treated at the Correctional Managed Care Outpatient Mental Health Services. At his Diagnostic and Evaluation Screening Interview Timmons reported that he had been hearing voices telling him to hurt himself since age 18 years old. He also stated he had been treated for paranoid schizophrenia since 1988. (Tr. 339-349). A note from August 31, 2006, states that Timmons "was in TDC from 1987-1993 for sexual assault with a fifteen year sentence and in 1995-1999 for a parole violation. He is unclear of how many times he has been in TDC on parole violations, usually cutting off his monitor. He most recently was in TDC from 2002-2004 for another violation." (Tr. 371-372). In that same treatment note, Timmons' psychiatric/mental health/social history/ was summarized as follows:

> He was first seen by a mental health professionals in 1986. He was using PCP and was hearing voices which usually were telling him to hurt or kill himself. He believes the street drugs made things worse. He was behaving very violently and erratically. He would go for days at a time without sleeping and was very paranoid. Thinking that people were out to get him. He went to MHMR on Dacoma Street and was prescribed haldol, seroquel, and trazadone. He continued his treatment while in TDC usually getting Haldol or Mellaril." (Tr. 371-372).

Other treatment notes contain similar mental health histories. (Tr. 374-375, 389-390, 394). Treatment plans signed by G. Pham, M.D. identifies Timmons' problem as "schizophrenia" and the date identified as 1987. (Tr. 351, 426).

The record also consists of treatment records from MHMRA of Harris County from 2008 and 2009. Timmons received treatment and medication maintenance. (Tr. 216-218, 219-220, 221-222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 239-240, 241-243, 244-245, 246-247, 254-258, 260-262, 264-266, 268-270, 272-274, 275, 276, 280, 282, 286, 288-299).

A Psychiatric Review Technique Form completed by Mark Schade, Ph.D. on October 16, 2009, states that there is insufficient evidence from November 1, 1984 to October 6, 2009, to complete the form. (Tr. 434-446). Based on the above described medical records, the ALJ concluded Timmons had no severe impairment prior to 2008 and denied his application at step two of the five step sequential evaluation process.

It is undisputed that Timmons was born in 1966. He worked briefly in 1983 and 1984. From January 1,1986 through June 6, 1993, he was incarcerated at the Texas Department of Corrections Institutional Justice Division. While incarcerated, Timmons turned age 22 on November 18, 1988. Four days after his release from prison, he applied for Supplemental Security Income benefits alleging that he had a debilitating impairment, schizophrenia, and that he was unable to work.  His application was granted. Since 1993, Timmons has been receiving SSI benefits.  Timmons attempted to obtain medical record relevant to his claim for child benefits but was unsuccessful. Timmons requested medical records from MHMRA and from the Texas Department of Criminal Justice Institutional Division but was advised that there were no records responsive to his request. Timmons requested a copy of his SSI file because the file would include the medical records relied on in

14

granting his application for SSI benefits in 1993. No medical records were not included in the agency file.

Timmons, relying on SSR 83-20, submitted three statements in support of his claim for child benefits. The statements are recollections of Timmons, his mother and a family friend about his life and, in particular, any changes in his personality before his 22nd birthday and afterwards. All three were available to testify at the administrative hearing. Timmons and his mother testified.

Denice Timmons, wrote:

My son, Aaron, was living with me and his father when he went to TDCJ (around October 1987). Before he went to prison, he had begun to show some serious mental problems. On one occasion when he was 16 years old, his father found him lying in the middle of Wilburforce Street, a very busy street. My son told us that he wanted to die and he was crying and flailing around. My husband picked him up and carried him back into the house. He did not explain why he wanted to die and we did not seek treatment for him. From that incident until he went to prison in 1987, I continued to worry about him because he was not the boy he had been. He acted strange but it was hard for us to put our finger on it. Because of this, I would stay awake at night and check on him as he slept. When I took my husband to work at 4:30 am, I would wake my older son, Ronald, and have him watch Aaron while he slept.

During the five years he was incarcerated, I visited him frequently at the prison. To the best of my recollection, sometime before the end of his first year in prison, I saw a great change in him. When he would come to the window, he would look like he did not know who we were. Before the visit was over, he seemed to remember who we were. Aaron always was very quiet during our visits as if he was heavily medicated. He was like a [z]ombie and could not keep his tongue in his mouth.

When he was released from TDCJ in the Summer of 1993, he moved back in with us and brought medication from prison. My understanding was that the medication was to treat a psychiatric condition and that his parole officer expected him to take it. Immediately after returning home, he applied for SSI and was approved. When he first got back from prison, he was very child-like and was extremely unhappy that our two young grandsons were living in the house. He told us he was the baby, not them. He told us we needed to put them out. He would constantly pace nervously around the house to talk to himself, drinking coffee and smoking cigarettes. We told him he really needed to calm down and not to talk to himself but he would get angry and

curse us. He did not seem to be able to control it. Sometimes he would engage us in conversation that made no sense. I finally just let him talk and acted as though I understood. He had an ankle monitor that he was required to wear by the prison officials and was ordered not to leave the house unless he had an appointment and he did not violate that requirement. I would accompany him to the parole and to the doctor at MHMRA. Because he was always with us, I can vouch for the fact that he was not using street drugs. No one was allowed to use drugs in our house. (Tr. 148-149).

Evoyn Moore, a long time family friend, wrote:

I have known Arron since 1969. He was around 2 ½ years old when I first met the family. When Aaron became a teenager I visited every day and sometimes spent the night. It was my home away from home. When he was little he was very talkative like his father and loved to be around people. When he was a teenager, he changed. He isolated from others and was very withdrawn. He also would talk to himself like he was trying to make sense of his life.

When he came home from prison the first time, I was living with his family. I remember him immediately pacing and being very agitated. He also constantly talked to himself. When I asked him who he was talking to, he said there are "voices in my head" and "people are following him around." When we would watch TV together, he thought the TV was talking to him. He would argue with the TV. When I told him that the TV was not talking to him, he would become very angry. To make the situation less tense, I would kid him and say, "You're crazy." I never gave up and to this day when I am there and hear him do the same thing, I still tell him he's crazy in the hopes he will see it and stop arguing with the TV.

When he got home from prison, he would constantly toss and turn while asleep and talk in his sleep constantly. He could have moved into a spare bedroom in his family's home but he insisted on sleeping in the living room on a sofa by the front door. He also insisted on surrounding the sofa with all of his possessions and everyone was warned to not touch any of his belongs. Even if someone was sweeping to close to his possessions, he would warn them that that was his area and stay away from it.

One day after he got back from prison, I handed him a plate with leftovers and asked him to go to the porch and feed the dog. During this conversation, he looked over at a tree across the street and said, "Look at the monkeys in the tree." I tried to get him to see that there were no monkeys in the tree but he refused. He said he saw them.

He also took a foot long wooden cross that we had and drilled a hole in it. He attached a string and wore the cross around his neck. He would wander through the

16

house and point it at us. He would tell us to live right and that there was evil in the house. He seemed to think that he had to constantly [confront] the evil he felt around him. After about two months, he stopped wearing the cross. It was common for him to say things that made no sense. Other family members ignored it, but I challenged him every time. I was trying to show him that his ideas did not make sense but it made no difference. He would just get mad and curse me.

When we were watching TV, he would let his tongue hang out of his mouth and did not seem to realize it. I would tell him. He would withdraw his tongue but then moments later it would hang out again. If no one mentioned it, it would hang out there for a long time. (Tr. 151-152).

Timmons wrote a personal statement about his time in prison and when he was released in 1993. He wrote:

Around October of 1987, I was sent to TDCJ for the first time. I was placed in the Beto I unit. At first I was put in general population and assigned to work in the shower area folding clothes. Shortly after I started that job, an inmate threatened me and I grabbed a large mop broom and tried to hit him. The guards grabbed me and locked me in a cell. I was transferred to the disciplinary unit and placed in a cell with other inmates. I was threatened sexually by one inmate there and I told him I was going to kill him. I told the guards and I was put in protective custody.  Then I was transferred to the Ferguson Unit and was assigned to work in the kitchen. I had only been prison a month or two when I was transferred to Ferguson. I quickly learned of a group of young inmates that called themselves the "Gladiators" and I was told by them I would have to fight for my life. I became extremely scared. The group would form a circle outside of the guards view and inmates would be forced to fight. I had to fight over and over. I couldn't take it and wanted to die. I began to cut myself on the arms with a razor to deal with the terrible stress I was under. I was put in lock-up for cutting my arms. I was taken to see a doctor and I told him that I was hearing voices and that I wanted to be dead.  I remember him because he was a Chinese man and had a big head. He put me on medication but I did not want to live and did not go to the pill window. The doctor then forced the medication by injecting it into me. This was sometime in 1988. When I was released from prison in June of 1993, I was told to go to MHMRA in Houston to continue my medication. I immediately went to the MHMRA clinic on Dacoma Street and continued to receive my medication every four weeks by injection. (Tr. 154).

At the June 8, 2010, hearing Timmons testified he was having mental problems before going to prison the first time. (Tr. 33).  He testified that he started getting injections of Haldol after his

17

transfer to the Ferguson Unit. Timmons testified this happened in 1988 but could not recall when in 1988 this occurred. (Tr. 35).

At step two, the claimant bears the burden of establishing a severe impairment. The ALJ found that Timmons had not shown he had a severe impairment because there were no medical records to support a severe impairment prior to 2008.  The ALJ also considered the personal statements submitted but again found them of little weight because of the absence of medical records to substantiate their respective recollections. Timmons argues that the ALJ erred in dismissing his application at step two based on the absence of medical evidence and in discounting the non-medical statements because the statements were not corroborated by medical evidence. Timmons argues that since there were no contemporaneous medical records, and his onset date was ambiguous, the ALJ erred by discounting personal recollections and by not seeking the assistance of a medical advisor. According to Timmons, a medical advisor could have assisted in  making an inference about the onset date of disability, especially in his situation where there are no medical records relating to Timmons' mental health prior to his 22nd birthday. Timmons further argues that he was denied his opportunity for a full and fair hearing to prove his disability by inference because the ALJ failed to follow SSR 83-20. SSR 83-20 provides a framework for situations where no precise evidence is available and there is a need to reasonably infer the onset date of a disabling impairment that occurred some time prior to the first recorded medical examination. Timmons argues that given the ambiguity about his onset date of schizophrenia, the ALJ could have and should have utilized the services of a medical advisor to help him infer the onset date of Timmons's schizophrenia, and to evaluate his claim that he was disabled due to schizophrenia before he turned age 22 on November 18, 1988.  The Commissioner counters that even assuming arguendo that Timmons is correct, and

18

the ALJ should have followed the procedures outlined in SSR 83-20, the onset date must still have

a legitimate medical basis.

SSR 83-20, which is binding of the Commissioner, address situations where precise evidence

is not available and there is a need for inferences. The ruling provides in pertinent part:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at the disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

> If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation. Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition. However, before contacting these people, the claimant's permission must be obtained  The impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record. (In mental impairment cases, see SSR 83-15, PPS-96, Titles II and XVI, Evaluation of Chronic Mental Impairments.)

> The available medical evidence should be considered in view of the nature of the impairment (i.e., what medical presumptions can reasonably be made about the course of the condition). The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death. Convincing rationale must be given for the date selected.

In addition, the Fifth Circuit in *Spellman v. Shalala*, 1 F.3d 357, 362-63 (5th Cir. 1993) held that,

where the evidence concerning the onset date is not definite and medical inferences must be made,

SSR 83-20 *requires* the ALJ to obtain the services of a medical expert. (emphasis added).  *see also*

*Burton v. Astrue*, No. 07-2227, 2008 WL 2890952, at *9 (E.D. Pa. July 24, 2008) ("Retrospective diagnosis of impairment even if uncorroborated by contemporaneous medical records, but corroborated by lay evidence relating back to the claimed period of disability, can support a finding of past impairment.  With some impairments, an ALJ can consider medical evidence obtained many years after the alleged onset date.").

Timmons' argument that the ALJ erred by not developing the record fully in accord with SSR 83-20 concerning the onset date of Timmons' schizophrenia and whether he was disabled prior to turning 22 on November 18, 1988 is well-taken.  Given the absence and unavailability of medical evidence from the time frame at issue, the fact that Timmons was awarded SSI benefits in 1993 based on his disabling condition of schizophrenia, the non-medical lay statements/testimony, which collectively suggest that Timmons' mental health issues began while he was an adolescent, his subsequent medical histories describing Timmons' symptoms and problems that reference 1987 and 1988 as his date of diagnosis of schizophrenia, Timmons' onset date is not definite and medical inferences are necessary. Because of the ambiguity, the ALJ could have and should have consulted with a medical advisor to assist him filing in the gaps in the record and to assist him in making an informed decision about the onset date of Timmons' schizophrenia. Because the ALJ failed to develop the record, the matter must be remanded to the Commissioner for consideration of Timmons' application for chid benefits based on his deceased father's account in light of the five step process for evaluating claims for adult child's disability benefits.

.

## VI.  Conclusion

Based on the foregoing, and the conclusion that the record was not developed fully and ALJ

erred at step two by denying Timmons' claim, and that further development of the record is necessary in accord with SSR 83-20, and that based on these infirmities in the ALJ's opinion substantial evidence does not support the ALJ's decision, the Magistrate Judge ORDERS that Defendant's Motion for Summary Judgment (No. 12), be DENIED, and that this case be REMANDED to the Social Security Administration pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

Signed at Houston, Texas, this 10th day of July, 2013

Frances H. Stacy
United States Magistrate Judge